THE AMERICAN SASH AND DOOR COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(JAMES A. GOTHARD, Defendant in Error.)

*Opinion filed April 20, 1927—Rehearing denied June 10, 1927.*

WORKMEN'S COMPENSATION—*when employer is liable for medical and hospital services.* The statute requires the employer, and not his insurer, to provide the necessary first aid, medical, surgical and hospital services, and although an injured employee who selects his own physician does so at his own expense, yet the employer will be liable for said physician's bills and for hospital bills where he has directed the employee to secure his own physician and makes no objection to the bills but merely turns them over to his insurer, but where the employee is afterwards sent to another hospital without any direction of the employer or the physician who had been treating him the employee makes his election to become liable for such subsequent medical and hospital services.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. HARRY M. FISHER, Judge, presiding.

ISADORE M. LEAVITT, for plaintiff in error.

MEEK & McDONALD, (GEORGE A. SCHNEIDER, of counsel,) for defendant in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

On March 25, 1925, James A. Gothard, defendant in error, was allowed by an arbitrator compensation in the sum of $490, payable in installments of $14 per week, and the further sum of $1729.02 for necessary first aid, medical, surgical and hospital services under paragraph (*a*) of section 8 of the Compensation act. This award was reviewed by the Industrial Commission, and on November 12, 1925, the award was sustained and ordered to stand as the award of the commission. The award was confirmed by the circuit court of Cook county on April 5,

1926. This court allowed a writ of error for a review of the judgment.

Defendant in error, James A. Gothard, (herein called respondent,) was injured by running a nail into his foot about six o'clock P. M. of July 22, 1924, while measuring the openings in the walls of a building in Chicago in process of construction, where some sashes and doors were to be placed by the American Sash and Door Company, plaintiff in error, (herein referred to as petitioner,) and for whom respondent was then working. About nine o'clock that evening he called his family physician, Dr. Carr. On the following day he telephoned A. J. Sofield, president of petitioner, and informed him that he had stepped on a nail while measuring the building, and Sofield asked him if he had gotten a doctor. Respondent replied that he had not until he had gotten home and that he then called one. Sofield further told him to get the doctor immediately to take care of his foot. Respondent replied, "All right; I want to get the doctor again this morning." He further stated that Sofield did not give him the name of any doctor and did not say anything about the insurance company or about its doctor, but told him that his injury was serious and might develop seriously.

Sofield in his testimony stated that when respondent advised him of the accident the next day he did not give him the name of any doctor to whom he should report and that he did not send any doctor out to see him. He did not know what the insurance company did about sending a doctor. He further stated that respondent told him that he had punctured his foot with a nail, which went into his foot about half an inch, and that he would not come down to work. He also stated that all he did was to notify the insurance carrier immediately and that what it did about sending a doctor he did not know; that he didn't think respondent was seriously injured, and that he simply called him up so he could go to the insurance company doctor;

326—4

that respondent's brother, Robert, told witness that they had taken respondent to the hospital, and that he told Robert that respondent should have notified witness first and have gone to the company's doctor, and that the insurance company's doctor should handle the case. He further stated that respondent's sister talked to him over the telephone about the bills, (doctors' bills and hospital bills,) and that he received them through the mail and then mailed them directly to the insurance company. The insurance company did not return the bills to him, and in about three weeks after the accident he received some kind of notice that the insurance company was in a financial difficulty, but that he did not tell Robert or the respondent that "they were up against it," meaning thereby that he did not tell them that the insurance company was insolvent.

Mildred Gothard's testimony is to the effect that she is a sister of respondent and talked to him at the Hinsdale Hospital and then talked with Sofield over the telephone about her brother's compensation, and asked Sofield what he was going to do about all the medical bills. She also talked with Seddon, who represented the insurance company, and about August 15 told him that her brother had undergone an operation. Seddon asked her if it would be satisfactory to have their doctor take care of the case, and she told him it would be satisfactory. She did not ask him to send out a doctor at any time. He simply asked her if it would be satisfactory, and after she informed him that it was, Dr. Wells came to the hospital to see her brother.

Seddon's testimony is, in substance, that he is the manager of the insurance company and had charge of the Gothard claim; that in August Miss Mildred Gothard came to his office to find out about her brother's claim against petitioner and asked if his company was able to pay her brother's compensation, and also informed him that Dr. Carr had taken charge of her brother; that on August 15 he told her the financial condition of the com-

pany was uncertain, but that he would have their doctor take charge of the case for treatment and tendered her the services of Dr. Wells; that she said it would be satisfactory to send Dr. Wells for the purpose only of examining her brother. He further stated that his duties with the insurance company were those of adjuster and attorney, and that on July 25 he received doctors' bills from Sofield, and that the only information that he had previous to his meeting Miss Gothard was that respondent had received a slight accidental injury, and that after her visit he mailed "a postal card" to petitioner requesting any further advice that the insurer might need with reference to the claim.

The evidence shows that Dr. Carr treated respondent's injury for a few days, and when an infection in his foot set in he was removed from his home to the Hinsdale Hospital. Blood poisoning developed and two operations were performed at that hospital. He remained there for six weeks, so seriously ill that it was necessary for him to have a private room and to have the care of a day and a night nurse. After he had been in the hospital about three weeks, during which time the bills aforesaid were sent to Sofield, and by him, in turn, to the insurance company, the insurance company for the first time tendered to respondent the services of Dr. Wells, its physician and surgeon. Respondent's brother talked with Dr. Wells and looked over his hospital and made inquiries as to his efficiency and standing as a physician and surgeon. According to the testimony of Dr. Wells he was directed (presumably by the insurance company) to go to the Hinsdale Hospital and offer his services to respondent. He went to the hospital on August 22, 1924, and talked with the respondent, and after examining him Dr. Carr suggested that he take the case and take the respondent to his hospital, the North Avenue Hospital. He told Dr. Carr that he was very glad that such offer came from him and that he would have the ambulance come after the respondent. He then had a talk

with petitioner's attorney, to whom he stated the suggestion of Dr. Carr, and told him he would send the ambulance after the respondent. He further stated that he did not see the history of respondent after this visit, which was on August 22; that at that time he had a serious case of infection, but it would not have been dangerous to have him removed to witness' hospital, but he admitted that his temperature might have risen higher after that. The evidence further shows that the ambulance was sent to the hospital on August 23, 1924, to remove respondent to Dr. Wells' hospital, which was about thirteen miles distant from the hospital in which respondent was then confined, but that he refused to go. It also shows by the testimony of respondent's nurses that his temperature on August 22 was 100.2 in the morning and in the evening of that day 102.7. He had had an operation performed on that day, and on the next morning his temperature was 101.3 and in the evening 102.2. It also appears that at the time the ambulance was sent for him he was suffering intensely, and the doctors familiar with his condition testified that it would have been dangerous to have removed him at that time. Whether or not he could have been removed from the hospital at that time with safety is a disputed question in the record.

It appears from the testimony of respondent that he sent his brother and sister to his employer and to the insurance company with authority to demand compensation and the payment of doctors' and hospital bills, etc.; also, that he was willing to be moved to the insurance company's hospital, but that he did not go in the ambulance to that hospital but refused to go for two reasons: (1) Because no arrangements had been made to that effect, presumably with his employer; (2) and because they informed him that Dr. Wells gave the direction to have him removed to his hospital; that his employer had given no such directions, and that neither Dr. Wells nor Dr. Carr had talked

to him about going to that hospital. It further appears from the evidence that after respondent had been treated for about six weeks in the Hinsdale Hospital he was taken to his home, where he remained for about a week and was then taken to the Frances Willard Hospital,—about the same distance from his home as the North Avenue Hospital, to which Dr. Wells had previously requested, with the consent of Dr. Carr, that he be moved,—and at the Frances Willard Hospital he submitted to another operation and received further care of nurses and medical attention for some time.

It is not disputed that respondent was entitled to recover the compensation that was awarded to him and payable weekly. The only question on this appeal is as to whether or not he is entitled to recover the sum of $1729.02, or any part thereof, awarded him for medical and hospital expenses, etc. As to the contested questions of fact in the record, we think the Industrial Commission and the court were justified in finding, as they did, for respondent.

Paragraph (*a*) of section 8 of the Compensation act provides that the employer shall provide the necessary first aid, medical and surgical services, and all necessary hospital services during the period for which compensation may be payable; also all necessary medical and surgical services for a period not longer than eight weeks, not to exceed, however, an amount of $200, and in addition such medical or surgical services in excess of such limit as may be necessary during the time such hospital services are furnished. All the foregoing services shall be limited to those which are reasonably required to cure and relieve from the effects of the injury. The employee may elect to secure his own physician, surgeon or hospital services . at his own expense.

The above statute requires the employer, and not the insurer of the employer, to provide the necessary first aid, medical and surgical services, etc. The employer may di-

rect his employee, when accidentally injured, to employ his insurer's doctor or surgeon when he is notified that the employee needs or requires such services. This record shows that petitioner did specifically direct respondent to employ Dr. Carr, whom he had first called to examine him. The court and the commission were also justified in finding from the evidence of Sofield, of Seddon, the adjuster, and of respondent's brother and sister, that Sofield never gave any direction to respondent as to the employment of a physician and surgeon other than Dr. Carr; that he was duly informed that respondent was removed from his home to the Hinsdale Hospital, and for three weeks or more he was asked to pay the medical, surgical and hospital bills, etc., and that all he did in response to such calls for payment was to mail the bills to the insurance company. He therefore waived his privilege of insisting that his company was not responsible for the services of Dr. Carr and for all bills made at the hospital that were necessary to a recovery of respondent. The liability of the insurance company is not in question in this suit. Petitioner is liable for all these services, because its president specifically directed respondent to employ Dr. Carr and made no objection to respondent's removal to the hospital and treatment there or to the bills rendered for such services. An employer is liable to his employee under such circumstances as are shown in this record when he or it directs the employee to employ his own physician to have his accidental injuries treated and cured, or when he or it absolutely refuses, when notified, to furnish medical and surgical aid and treatment or to pay for the same. *Chicago-Sandoval Coal Co.* v. *Industrial Com.* 294 Ill. 351; *Armour Grain Co.* v. *Industrial Com.* 323 id. 80.

After respondent was removed from the Hinsdale Hospital to his home he was then removed to the Frances Willard Hospital without any direction from Dr. Carr or of petitioner and there received treatment and services. For

this reason we think respondent made his election to accept such services and is liable for the same. Dr. Carr had consented to his removal to Dr. Wells' hospital, who is shown by the evidence to be an expert in the treatment of such infections.

The judgment of the circuit court is reversed and the cause is remanded, with directions to have definitely fixed the amount of petitioner's liability in accordance with the views herein expressed.

*Reversed and remanded, with directions.*